472 So.2d 748 (1985)
HILLSBOROUGH COUNTY HOSPITAL AUTHORITY, d/b/a Tampa General Hospital, Appellant,
v.
TAMPA HEART INSTITUTE and Department of Health and Rehabilitative Services, Appellees.
UNIVERSITY COMMUNITY HOSPITAL, Appellant,
v.
TAMPA HEART INSTITUTE, Tampa General Hospital, St. Joseph's Hospital and Department of Health and Rehabilitative Services, Appellees.
Nos. 84-772, 84-913 and 84-839.
District Court of Appeal of Florida, Second District.
May 22, 1985.
*749 Julian Clarkson and John Radey of Holland & Knight, Tallahassee, for appellant Tampa Gen. Hosp.
Alan C. Sundberg and Cynthia S. Tunnicliff of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tallahassee, for appellant University Community Hosp.
Barry Richard of Roberts, Baggett, LaFace, Richard & Wiser, Tallahassee, and *750 Chris William Altenbernd of Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, for appellee Tampa Heart Institute.
M. Stephen Turner of Culpepper, Turner & Mannheimer, Tallahassee, for appellee Dept. of Health and Rehabilitative Services.
CAMPBELL, Judge.
Appellant, Hillsborough County Hospital Authority (Tampa General), in this administrative appeal seeks review of two orders entered by the Department of Health and Rehabilitative Services (HRS). The first order (April 10, 1984) is a final order holding Tampa General in default and denying Tampa General the right to further participate as a party in the formal administrative proceedings under section 120.57, Florida Statutes (1983). The second order (April 23, 1984) is a final order dismissing the proceedings with prejudice. Appellant, University Community Hospital (UCH), also appeals HRS' April 10th order wherein UCH was denied its renewed motion to intervene. We reverse in part and affirm in part.
The salient facts of this case are as follows: On August 11, 1982, UCH applied for a certificate of need (CON) to provide cardiac catheterization and open heart surgery services to patients of Hillsborough County. HRS denied the application November 30, 1982, and requested the Division of Administrative Hearings (DOAH) to assign a hearing officer for a formal hearing pursuant to section 120.57, Florida Statutes (1982). On November 12, 1982, in a separate batching cycle[1], Tampa Heart Institute (Tampa Heart) filed an application with HRS for a CON to build a cardiac specialty hospital with an open heart surgery and cardiac catheterization capacity in Tampa. After an initial denial on the staff level, HRS' secretary, David Pingree, receded from the recommended denial and granted Tampa Heart a CON for the project as proposed with the condition that the majority of beds be available to residents of Central and South America. HRS apparently justified its disposition by noting that its cardiac catheterization and open heart methodologies[2] measure only local need, while Tampa Heart proposes to serve primarily Latin American residents. Thus, HRS found that "the Tampa Heart proposal does not lend itself to analysis which uses formulas predicating serviceneed projections entirely on local population and use statistics."
Tampa General has extensive existing cardiac catheterization and open heart surgery capability and is located in the same service area as the proposed Tampa Heart facility. Apparently, concluding that the proposed new facility would bring about duplication of existing facilities which ultimately would affect health care, Tampa General applied for a formal administrative hearing pursuant to section 120.57 to contest the proposed grant for Tampa Heart. St. Joseph's Hospital (St. Joseph's), which is also located in Tampa, petitioned for such a hearing as well. HRS referred those petitions, which were consolidated, to a hearing officer assigned by DOAH.
Meanwhile, UCH prepared for hearing on its earlier filed application. UCH, in a later filed amended petition for leave to intervene in the Tampa Heart proceedings, alleged that it did not earlier seek to intervene in Tampa Heart's application because: (1) HRS' grant of a CON to Tampa Heart was a proposed, nonfinal agency action and could not be counted on as an "approved" facility for purposes of determining the need for UCH's proposal; (2) the UCH and *751 Tampa Heart proposals were different and incomparable because HRS used different standards to evaluate them; (3) UCH, by filing earlier, enjoyed a priority to have its application reviewed without regard to Tampa Heart's application in a later batching cycle; (4) HRS gave no notice that it would depart from its past rulings and treat the proposed grant of a CON as final for all purposes.
In October 1983, during final hearings on its application, UCH learned that HRS intended to consider Tampa Heart as an "approved" facility for purposes of determining the need for cardiac services at UCH. UCH claims it did not intervene in Tampa Heart's case at that time because of its view that case law established that Tampa Heart could not have an approved CON until entry of a final order at the conclusion of its administrative proceeding, which was not scheduled for some time.
On January 16, 1984, the final hearing on Tampa Heart's application began[3]. Early in the hearing, during an unrecorded bench conference, DOAH hearing officer, Chris Bentley, engaged in a discussion with all counsel concerning settlement possibilities. A recess in the final hearing[4] took place after which Bentley orally ordered all counsel to proceed in good faith to pursue a negotiated settlement and to instruct him if the proposed settlement concept was not acceptable. According to Bentley and the attorneys for all the parties except Tampa General, the proposed concept of settlement was that the proposed Tampa Heart facility would be consolidated with the existing Tampa General facility and that all the parties would agree to immediately dismiss the litigation while details of the settlement were worked out. Bentley's perception that Tampa General failed, in good faith, to comply with his oral order resulted in the ultimate default of Tampa General and a dismissal of the section 120.57 proceeding pursuant to the presumed authority of Florida Administrative Code rule 28-5.211.
The proposed settlement appeared in jeopardy on or about January 25, 1984, when, for the first time, Tampa General's counsel advised Tampa Heart's counsel that the dismissal concept was unacceptable, which resulted in a procedural hearing requested by Tampa Heart in Tallahassee on January 27, 1984. At this hearing, Tampa Heart's counsel (Mr. Baggett) orally moved to dismiss Tampa General as a party on the ground that Tampa General had exhibited "bad faith ... in its participation in attempted settlement negotiations ... and representations to the hearing officer allegedly causing a lengthy delay in the final hearing." The hearing officer directed that the motion to dismiss be reduced to writing and an evidentiary hearing on the motion was scheduled in Tampa for the following Monday, January 30, 1984.
UCH immediately sought to intervene in Tampa Heart's case when it learned of these events, believing that its interest finally had been affected in two ways. UCH first alleged that final agency action on Tampa Heart's application appeared to be imminent, strengthening HRS' assertion that Tampa Heart was an "approved" facility. *752 Secondly, UCH alleged that by denying UCH's earlier application for lack of need, but then granting St. Joseph's much later application, HRS had acted inconsistently and unconstitutionally to UCH's detriment. The hearing officer denied the petition to intervene as untimely. Florida Administrative Code rule 28-5.207 requires persons other than original parties to petition for leave to intervene at least five days prior to the commencement of final hearing of the proceeding.
Meanwhile, Mr. Baggett stated his readiness to proceed with this case on January 30, 1984. Tampa General's counsel also informed the hearing officer and the parties that it appeared that there was no alternative other than reconvening the final hearings on Monday morning, January 30, 1984. However, when the hearing reconvened on January 30, 1984, Baggett sought and obtained leave to proceed with his now written motion to dismiss. Presumably, because there was no record of the "orders" that Tampa General was accused of violating, counsel for each party was permitted to make a "representation" of his recollection of what led to and what occurred during a settlement recess. Counsel for Tampa Heart, St. Joseph's and HRS represented that there had been an understanding among all the lawyers before the hearing adjourned on January 18, 1984, that the litigation would be terminated before settlement in any form was agreed to by Tampa Heart. Counsel for Tampa General represented to the contrary.
The hearing on the motion to dismiss was concluded January 31, 1984, without any ruling having been announced. Two days later, Tampa General's governing authority voted not to accept the proposed settlement. Bentley then held hearings on February 3 and 6, 1984, to afford Tampa Heart an opportunity to demonstrate prejudice because of the delay in the final hearing.
On February 20, 1984, with the case still pending, UCH filed a renewed motion to intervene because of changed circumstances. The hearing officer denied the renewed motion.
Ultimately, Bentley filed his recommended order concluding Tampa General and its counsel had been guilty of bad faith in pursuing settlement negotiations and that Tampa General "be held in default and not allowed to cross-examine witnesses or to otherwise participate in this proceeding as a party." Tampa General moved to set aside the recommendation and a successor hearing officer, Mr. William Williams, conducted a hearing on the motion and entered an order striking the affidavits attached to Tampa General's motion, denying its motion to set aside the recommendation of default, closing the file on Tampa General's petition and denying UCH's renewed petition for leave to intervene. Thereafter, HRS' secretary, Pingree, entered the agency's final order adopting Bentley's and Williams' recommended order. UCH timely appealed. Tampa General also timely appealed and pursuant to rule 9.310(b)(2), the appeal automatically stayed Pingree's order. However, upon receipt of an agreement dated April 20, 1984, and signed by Tampa Heart, St. Joseph's and HRS, Pingree entered an order dismissing with prejudice the challenges to Tampa Heart's CON and closing the file on these cases. Tampa General also timely appealed from that order and the two appeals have been consolidated.
Tampa General argues four points in support of its appeal. We agree that error was committed in the proceeding below in regard to the subject matter of each point raised by Tampa General and, therefore, reverse the actions of the lower tribunal. As will be seen from our discussion hereafter, though we do not agree totally with the reasoning of Tampa General in support of its position, we arrive at the same conclusions.
The first two points raised by Tampa General will be discussed and disposed of jointly as we perceive that they are inextricably intertwined. Those points are as follows:
I. WHETHER HRS ERRED IN ORDERING A DEFAULT AGAINST TAMPA GENERAL BECAUSE AN *753 ADMINISTRATIVE AGENCY HAD NO AUTHORITY TO IMPOSE SANCTIONS AT THE TIME THE ORDERS WERE ENTERED.
II. WHETHER THE HEARING OFFICER'S ORDER, ADOPTED BY HRS, WAS A PRODUCT OF PROCEDURES THAT FAILED TO COMPLY WITH DUE PROCESS OR THE ESSENTIAL REQUIREMENTS OF LAW.
Tampa General relies heavily on Great American Banks, Inc. v. Division of Administrative Hearings, 412 So.2d 373 (Fla. 1st DCA 1981) as being controlling on the issues raised here. While we believe Great American and the reasoning behind that decision is highly persuasive, we do not conclude that that decision is directly on point and, therefore, controlling.
Tampa General construes Great American as holding that section 120.58(3) requires the resort to section 120.69 to enforce all orders of a hearing officer where there is an attempt to impose sanctions for violations of those orders. We do not construe Great American so broadly. We conclude that the resort to section 120.69 for enforcement of orders arising under section 120.58(3), as discussed in Great American, is limited to subpoenas or orders directing discovery. While section 120.69 also provides for enforcement of "agency action," the only resort to section 120.69 discussed in chapter 120 that involves imposing sanctions for violations of orders of hearing officers prior to "agency action," is that provided in section 120.58(3) and is limited, as we have heretofore concluded, to matters involving subpoenas or orders directing discovery. We believe that our construction of the holding in Great American is reinforced by the acts of the Florida Legislature which, in 1984, amended sections 120.58(1)(b) and (3) to allow an agency or a hearing officer to impose sanctions, excluding contempt, for violations of the power to swear witnesses, take testimony and effect discovery. Section 120.58(3), Florida Statutes (1984) still limits enforcement of such a sanction imposed to an action in circuit court.
Although we construe Great American and section 120.58 as we have stated, we further conclude that the reasoning of Great American and the legislative intent we perceive from chapter 120, compels us to hold that there is no authority delegated to an agency or its hearing officer to hold a party in default and subject to dismissal as a sanction for failure to comply with procedural orders of the agency or hearing officer. Default and dismissal are severe sanctions or penalties for failure to comply with procedural orders.
Appellees argue that we should hold that an administrative agency has power to adopt rules providing for dismissal or default as a sanction for such violations. Thus, they argue that Florida Administrative Code rule 28-5.211, adopted by the Florida Administration Commission as a model rule for all agencies which have not adopted contrary rules of their own, properly allows dismissal and default by an agency or hearing officer for failure of a party to comply with a lawful order.
In support of their argument, appellees cite several cases to us likening an administrative agency's power to enforce its orders to that of the courts. Warriner v. Ferraro, 177 So.2d 723 (Fla. 3d DCA 1965), cert. denied, 188 So.2d 319 (Fla. 1966), cert. denied, 385 U.S. 995, 87 S.Ct. 610, 17 L.Ed.2d 454 (1966); Local 415, Miami Joint Council Of the International Ladies' Garment Workers' Union v. William Weitz, Inc., 141 So.2d 18 (Fla. 3d DCA 1962). Thus, appellees argue that rule 28-5.211 applies to this proceeding's situation as would Florida Rule of Civil Procedure 1.420(b) apply to a judicial proceeding. The fallacy in appellees' argument lies, however, in the fact that rule 1.420(b) was adopted in exercise of the inherent power of courts. Surrency v. Winn & Lovett Grocery Co., 160 Fla. 294, 34 So.2d 564 (Fla. 1948); State v. Tedder, 123 Fla. 188, 166 So. 590 (Fla. 1936); Ray v. Williams, 55 Fla. 723, 46 So. 158 (1908); Rashard v. Cappiali, 171 So.2d 581 (Fla. 3d DCA 1965). No such inherent authority *754 exists in administrative agencies. Section 120.54(14), Florida Statutes (1983) expressly and explicitly commands that "[N]o agency has inherent rulemaking authority; nor has any agency authority to establish penalties for violation of a rule unless the Legislature, when establishing a penalty, specifically provides that the penalty applies to [the] rules."
If an agency is explicitly prohibited from establishing a penalty for violation of a rule, even more so is there no inherent or implied power to provide for a sanction in the nature of a penalty for violation of procedural orders of an agency or hearing officer. We conclude this analysis to be sound after considering the interchangeable use and meaning of the terms "penalty" and "sanction." Vining v. Florida Real Estate Commission, 281 So.2d 487, 491 (Fla. 1973). Gershanik v. Department of Professional Regulation, Board of Medical Examiners, 458 So.2d 302, 305 (Fla. 3d DCA 1984); Black's Law Dictionary 1203 (5th ed. 1979); 2 Bouvier's Law Dictionary 3005 (3d rev. 8th ed. 1914).
In our view, the dismissal of a proceeding and the default of a party whose substantial interests are affected by a proceeding is a harsh penalty when imposed as a sanction for violations of procedural orders. Moreover, it is, to us, clear that when the representative of a party has engaged in bad faith actions during a proceeding, the remedy should not be rule 28-5.211, even if valid, but rule 28-5.1056(2) and (3). The latter rule establishes standards of conduct for representatives of parties and remedies of disqualification, censure or suspension of the representative for failure to comply with those standards. Certainly, Tampa General, whose governing authority is a public body created as the Hillsborough County Hospital Authority by chapter 80-510, Laws of Florida (1980), should not be severely penalized by dismissal and default from a proceeding where its substantial interests are involved by reason of alleged misconduct or "bad faith" on the part of its representatives.
Thus, we declare that Florida Administrative Code rule 28-5.211 is an invalid exercise of undelegated power insofar as it purports to allow an agency or hearing officer to dismiss a proceeding and default a party for failure to comply with procedural orders of an agency or hearing officer. Appellees argue that that rule is a valid exercise of power authorized by construing together sections 120.53(1)(c), 120.54(10), 120.57(1) and 120.65(2) and (7). Those statutes combined contain no express grant of the authority of dismissal or default to overcome the explicit command of section 120.54(14). Therefore, we conclude that the actions below must be reversed because of the error committed as pointed out in Tampa General's points I and II.
We also reverse on point III raised by Tampa General as:
III. WHETHER THE HEARING OFFICER AND HRS ERRED IN FINDING 1) THAT "DISMISSAL OF THE PENDING LITIGATION WAS A PREREQUISITE TO NEGOTIATION" AND 2) THAT TAMPA GENERAL OR ITS COUNSEL WAS GUILTY OF BAD FAITH.
Tampa General argues on this point that the evidence of lack of "good faith" on the part of representatives of Tampa General will not support the orders of dismissal and default. If the sufficiency of the evidence were the sole issue on this point, under our standard of review, we would be required to affirm on this issue. However, we see the overriding problem not as sufficiency of the evidence, but as the sufficiency and reasonableness of the order of the hearing officer alleged to have been violated.
As we pointed out earlier, some time into the final hearing the discussion of settlement occurred. Because of the lack of any transcript or other record evidence, we do not know how or by whom this discussion originated. As a result, however, the parties were asked if they could, in good faith, attempt a settlement and, if so, a recess in the hearing would be ordered. That action occurred. What subsequently developed is somewhat in dispute.
*755 First of all, if sanctions were contemplated to be imposed for violation of that order, it should have been reduced to writing as Tampa General argued under its first two points on appeal. If the order had been reduced to writing, there would have been no dispute as to its requirements.
Secondly, we do not believe the order, as construed by appellees and the hearing officer, was reasonable. Regardless of our holding on points I and II, we doubt any authority in an agency or hearing officer to order parties in the middle of a section 120.57 hearing to negotiate settlement in good faith or subject themselves to sanctions. Particularly would this be true in regard to the disputed parts of the purported negotiation agreement and order. Appellees argue, and the hearing officer found, that in order to negotiate a settlement in good faith, the prime prerequisite was for Tampa General to dismiss the entire proceeding. That plan equates to an agreement that "we will agree to close the barn door if you will agree to let the horse out first." Good faith negotiations require good faith on both sides. To require one party to "give up" in order to negotiate seems to be more coercion than negotiation. A requirement of dismissal of a proceeding as a prelude to settlement is no settlement. It must also be observed and considered that Tampa General is a public body that must act according to Florida's Sunshine Laws and through its duly authorized board. It would be improper to impose such requirements on such a body and then attempt to enforce those requirements by administrative sanctions. We, therefore, reverse on Tampa General's point III.
Point IV raised by Tampa General is as follows:
IV. WHETHER HRS' ORDER DISMISSING TAMPA GENERAL'S PETITION WITH PREJUDICE IS VOID BECAUSE IT WAS ENTERED IN VIOLATION OF AN AUTOMATIC STAY OF PROCEEDINGS.
We conclude that Florida Rule of Appellate Procedure 9.310(b)(2) automatically stayed further action by appellee HRS and the proceedings taking place after this appeal are invalid. However, in view of our reversal on other grounds, those proceedings are now moot and we decline to award attorney's fees pursuant to section 120.57(1)(b)9, Florida Statutes (1983).
We now briefly turn to the appeal of UCH of the denial of its motion to intervene. The denial of UCH's application for a CON is the subject of another appeal in this court and we do not consider that issue or those proceedings. We conclude that the hearing officer was correct in denying UCH's motion to intervene as not being timely filed pursuant to Florida Administrative Code rule 28-5.207. However, because of our disposition of Tampa General's appeal, this matter must be set for hearing anew and, based upon their earlier motion to intervene, UCH shall be allowed to participate as an intervening party in such renewed hearings.
Pursuant to section 120.68(8) and (12), Florida Statutes (1983), we remand to the agency (HRS) for a new section 120.57 hearing on Tampa General's and St. Joseph's petition with UCH participating as an intervenor.
Reversed and remanded on Tampa General's appeal.
Affirmed and remanded with instructions on UCH's appeal.
OTT, A.C.J., and SCHOONOVER, J., concur.
NOTES
[1] The "batching cycle" rule is rule 10-5.07, Florida Administrative Code, which requires that applications for hospital projects filed within the same three-month period be reviewed in relation to each other.
[2] A hospital proposing to offer these services must demonstrate compliance with the need methodologies in rule 10-5.11(15) (cath cart) and (16) (open heart). Sections 15 and 16 determine the need for additional cardiac services by measuring whether existing and approved facilities will be able to handle the number of catheterizations and open heart procedures anticipated in the local area three years in the future. If these facilities will be unable to serve the projected number, a need exists.
[3] At prehearing in August 1983, Tampa General opposed the hearing date of January 16, 1984, and later filed a motion for clarification and revision of order, seeking a continuance of the January 16 date. When the continuance was denied, Tampa General filed an appeal in this court and sought a stay from both the hearing officer and the appellate court. The motions for stay were denied and this court affirmed the hearing officer's order denying the continuance. When the hearing began on January 16, 1984, Tampa General filed a motion for remand, again seeking a continuance of the final hearing. The motion was denied.
[4] UCH adds in its brief that it learned during the recess that HRS, Tampa Heart and St. Joseph's intended to settle. Under the settlement terms, Tampa Heart would receive approval for two rather than three catheterization labs. That would amount to six existing and approved labs, one more than needed in the area. The settlement also provided that St. Joseph's would receive an additional catheterization lab, even though its application had been filed after both UCH and Tampa Heart filed and despite the fact that the proposed grant of two labs to Tampa Heart negated any additional need.